UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**STEPHEN BENJAMIN**,       Case Number 5:12 CV 1372

    Plaintiff,       Judge Christopher A. Boyko

    v.       REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.       Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Stephen Benjamin filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI) and disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated June 1, 2012). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on February 18, 2009, alleging a disability onset date of January 1, 2004, due to tremors and breathing problems. (Tr. 123-27, 160). His claims were denied initially (Tr. 77-82) and on reconsideration (Tr. 88-96). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 9). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 13, 29). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On June

1, 2012, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

Personal and Vocational History

Born April 30, 1949, Plaintiff was 61 years old at the time of the ALJ's decision. (Tr. 24, 37). He has a high school education and completed two years of college. (Tr. 38). Plaintiff testified he had been unemployed since 2004. (Tr. 69). Prior to his alleged disability, Plaintiff worked as a labor consultant from 1995 to 2004, and a security guard from 1982 to 1991. (Tr. 143).

Concerning daily activity, Plaintiff cooked, did laundry, and watched television. (Tr. 47, 50). He testified he lived with a friend and his wife. (Tr. 50). Plaintiff claimed he could not work because of chest pain, dizzy spells, tremors in his hands, and shortness of breath. (Tr. 39, 41). In a report to SSA, Plaintiff said he smoked 3-4 cigarettes per day. (Tr. 155). In addition, treatment notes indicated Plaintiff had smoked marijuana daily for 45 years, and 5-10 cigarettes daily for 40 years. (Tr. 316). However, at the ALJ hearing, Plaintiff indicated he had quit smoking marijuana and cigarettes. (Tr. 49).

Medical History

On May 6, 2009, Plaintiff saw Dr. Nadia McKitty for a consultive medical examination. (Tr. 198-200). Plaintiff complained of difficulty breathing both at rest and during exertion. (Tr. 198). He admitted he had smoked cigarettes for the past 40 years. (Tr. 198). He also complained of occasional chest pain, the pain being 5/10 at worst. (Tr. 198). He reported he could sit, stand, and walk on his own without the use of an assistive device. (Tr. 199). He could also bathe, shower, dress himself, and tend to personal hygiene. (Tr. 199). On examination, Plaintiff was awake, alert, oriented, and in no apparent distress. (Tr. 199). His heart rate and rhythm were normal, but a systolic murmur was

present. (Tr. 199). He did not cackle or wheeze, but "some rhonchi [was] present diffusely over his entire lungs." (Tr. 199). Dr. McKitty diagnosed dypsnea of uncertain etiology, and opined it did not appear Plaintiff could do many activities at that time due to his breathing difficulties. (Tr. 200). Plaintiff did not mention or complain of tremors in his hands. Indeed, on a muscle evaluation report, Dr. McKitty noted Plaintiff's grasp, manipulation, pinch, and fine coordination were normal in his left and right hands. (Tr. 201).

The next day, May 7, 2009, Plaintiff went to Summa Western Reserve Hospital stating he had experienced shortness of breath for 3-4 weeks, worse on exertion. (Tr. 209, 231). His chest and lungs showed rales but were otherwise normal and his heart rate and rhythm were regular. (Tr. 232). No murmurs, rubs, or gallops were present. (Tr. 232). Chest x-rays showed "nonspecific chronic lung changes and a possible focal left density in the left upper lobe." (Tr. 232). An EKG showed atrial fibrillation. (Tr. 232). An echocardiogram was normal other than moderately reduced left ventricular ejection fraction (LVEF), without wall abnormalities. (Tr. 320). Plaintiff was diagnosed with atrial fibrillation with rapid ventricular response, shortness of breath, hypersensitive urgency, tobacco use, marijuana use, chest pain, and left upper lobe density. (Tr. 231). His atrial fibrillation was controlled with medication, and Plaintiff improved during his stay. (Tr. 225). Treatment notes indicated Plaintiff "constantly complained of shortness of breath even though his vital signs, saturations, and x-rays were all normal." (Tr. 233). He was put on Coumadin, his prognosis was good, and he was discharged in stable condition with instruction to follow-up with his primary care physician Dr. LeFever. (Tr,. 233).

On June 6, 2009, Plaintiff saw cardiologist Dr. Heupler for a routine follow-up. (Tr. 313-14). Dr. Heupler noted Plaintiff's atrial fibrillation was "minimally symptomatic" and controlled with

3

medication. (Tr. 314).

On July 14, 2009, pulmonary function testing showed mild lung obstruction, but improvement after a bronchodilator was administered. (Tr. 259). On July 25, 2009, state agency physician Lynne Torello, M.D., found Plaintiff did not have COPD based on normal pulmonary function tests. (Tr. 270). Indeed, Plaintiff's pulmonary function tests were within normal limits on December 14, 2009. (Tr. 251).

On August 11, 2009, Plaintiff returned to Dr. Heupler's office for a follow-up visit. (Tr. 297). Nurse Practitioner (NP) Maureen Mayer noted Plaintiff felt much better, denied dizziness, had no chest pain, and noticed a great deal of improvement concerning shortness of breath. (Tr. 297, 299). Her notes also reflected he showed "no clinical signs of heart failure whatsoever." (Tr. 297). His sinus rhythm, heart rate and rhythm, and blood pressure were normal. (Tr. 297-98). NP Mayer indicated the ongoing "goal [was] to keep him in regular rhythm." (Tr. 298).

Plaintiff's echocardiogram on September 1, 2009 was essentially normal except for symmetrical moderate septal hypertrophy, without evidence of left ventricular outflow tract obstruction. (Tr. 272). There was no obstructive cardiomyopathy, but Plaintiff had mild to moderate tricuspid insufficiency. (Tr. 273).

Plaintiff saw Dr. Heupler on October 26, 2009 for a follow-up visit and reported he felt better but was not back to normal. (Tr. 291). He denied chest pain, syncope, or pre-syncope, and reported smoking 3-5 cigarettes per day. (Tr. 291). After counseling Plaintiff about the negative effects of smoking and his condition, Plaintiff "[did] not seem too inclined to make [a] lifestyle change." (Tr. 292). An echocardiogram revealed moderate left ventricle hypertrophy with normal LV function, but no significant valve disease. (Tr. 296). Dr. Heupler noted that "[c]ompared with a study from

5/08/09, the LVEF ha[d] improved back to normal and [Plaintiff] [had] [normal sinus rhythm]." (Tr. 296). Dr. Heupler wanted to monitor Plaintiff's atrial fibrillation, but was perplexed by complaints of shortness of breath because he had no significant valve disease, nor was there any "evidence of diastolic dysfunction of any significance." (Tr. 292). Dr. Heupler stated he "[did] not really have a great cardiac explanation for the shortness of breath" and ordered a stress test to rule out coronary disease. (Tr. 292). Plaintiff underwent said stress test on November 2, 2009, which yielded normal results. (Tr. 286-87, 289). During the physical exam, which involved Plaintiff walking on a treadmill, he experienced no chest discomfort and his "exercise capacity [was] good." (Tr. 286). He also had a normal heart rate response to exercise, but abnormal left LV functioning post-exercise. (Tr. 286). Review of the stress images revealed no myocardial perfusion defects and peak exercise regional wall motion was normal. (Tr. 286).

On November 20, 2009, occupational therapist Carol Little performed a functional capacity evaluation. (Tr. 329-37). She noted Plaintiff's participation was limited due to over-guarding. (Tr. 329). She further noted Plaintiff's demonstrated physical functioning "should not be used to project actual work capacity since he may be able to function at a higher level than willing." (Tr. 329). Ms. Little found tremors and depression were the main factors limiting Plaintiff's work ability. (Tr. 329). On examination, Plaintiff was able to ascend and descend 42 stairs using a reciprocal gait pattern and hand rail with normal heart rate rhythms. (Tr. 333). Plaintiff described his breathing difficulty as a three on ten point scale, which occurred with activity or "any prolonged repetitive task". (Tr. 331). Notably, Ms. Little's findings focused on Plaintiff's "marked tremors" which precluded him from fine manipulation coordination. (Tr. 329-35). There was minimal focus, if any, on Plaintiff's chest pain and shortness of breath. She found Plaintiff, at the least, should be able to function at the DOL

classification of sedentary, but his ability to manipulate small items or perform fine motor dexterity tasks were limited due to tremors. (Tr. 329). For material handling, he could lift five to fifteen pounds, non-material ten to 20 pounds. (Tr. 337).

Six months later, in April 2010, Dr. Hutchinson-Uloa reviewed and signed Ms. Little's functional capacity assessment. (Tr. 329). Dr. Hutchinson-Uloa did not perform the evaluation. Indeed, the report specifically stated the evaluation was Ms. Little's professional opinion in her capacity as an occupational therapist "designed to provide skilled rehabilitative therapy on a [one] time basis". (Tr. 329, 337). Moreover, at the ALJ hearing Plaintiff's counsel acknowledged the evaluation was not performed by Dr. Hutchinson-Uloa. (Tr. 40).

Plaintiff returned to NP Mayer at Dr. Heupler's office for a follow-up on December 29, 2009. (Tr. 359). Examination revealed normal lung symmetry and clear auscultation in all lung fields. (Tr. 360). His atrial fibrillation was managed and he remained in regular rhythm. (Tr. 360). The next month, Plaintiff followed-up with Dr. Heupler who found Plaintiff "was doing pretty well." (Tr. 364). He was not having chest pain, shortness of breath, or edema, and walked his dog in the evening. (Tr. 364, 367). A March 5, 2010 chest x-ray was normal and showed only "[o]ld granulomatous disease", with no additional abnormalities. (Tr. 350-51).

Plaintiff saw Dr. Hutchinson-Uloa on numerous occasions between October 6, 2010 and April 20, 2010. (Tr. 377-81). Mainly, Plaintiff complained of chest pain, which Dr. Hutchinson-Uloa controlled with Vicodin. (Tr. 377, 378, 379).

At a follow-up visit with Dr. Heupler in June 2010, Plaintiff reported feeling "the best he ha[d] felt in years." (Tr. 369). He denied chest pain and palpitations, but did report dizziness. (Tr. 369). Plaintiff admitted to continued tobacco use. (Tr. 369). A stress test revealed decreased ejection

fraction, but Dr. Heupler felt the report was not accurate. (Tr. 370). Plaintiff was stable and his conditions medically managed. (Tr. 370) He was instructed to follow-up in four months. (Tr. 370).

ALJ's Decision

On November 27, 2010, the ALJ found Plaintiff had severe impairments – paraoxysmal atrial fibrillation, mild to moderate tricuspid valve insufficiency, and obesity – but he could perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.927(c) with restrictions. (Tr. 18-19). The ALJ specifically noted Ms. Little's functional capacity evaluation and Dr. Hutchinson-Uloa's signature on the same. (Tr. 21-22). The ALJ noted Ms. Little cautioned the use of her assessment to predict actual work capacity and her opinion that he was able to function at a sedentary level. (Tr. 21). The ALJ gave Ms. Little's assessment little weight for several reasons. (Tr. 21-22). First, he noted her primary limitations were the result of tremors and depression, neither of which were severe medically determinable impairments, nor reported anywhere else in the record. (Tr. 21-22). He also found Ms Little was not an acceptable medical source and addressed Dr. Hutchinson-Uloa's signature on the assessment. (Tr. 22). The ALJ found no indication the physician examined Plaintiff for this evaluation and noted the report specifically stated it was Ms. Little's opinion in her professional capacity as an occupational therapist. (Tr. 22).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ's RFC finding is not supported by substantial evidence. (Doc. 13, at 12-14). Plaintiff further argues the ALJ failed to follow the treating physician rule concerning Ms. Little's functional capacity assessment and Dr. Hutchinson-Uloa's signature on the same. (Doc. 13, at 7-11). Finally, Plaintiff argues the ALJ erred at Steps 4 and 5 of the sequential analysis concerning past relevant work related to his SSI claim. (Doc. 15, at 2-3).

*RFC Finding*

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. An ALJ must also consider and weigh medical opinions. *Id.* § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

9

The ALJ found Plaintiff capable of medium work avoiding concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 19). Medium work requires the ability to lift and carry up to 50 pounds occasionally and 25 pounds frequently. 20 C.F.R. § 404.1567(c). Plaintiff contends there "is no medical opinion contained in the record that remotely supports the finding that Plaintiff can lift up to 50 pounds." (Doc. 13, at 13). Not so.

First, the ALJ aptly pointed out Plaintiff's lifting abilities were difficult to identify due to Plaintiff's sub-maximal effort. (Tr. 21, 336). Nonetheless, during his evaluation with Ms. Little, Plaintiff was able to lift in excess of 50 pounds with both the right and left hand for numerous muscle/grip tests. (Tr. 335-36). Coupled with these tests, Ms. Little also found Plaintiff may be able to function at a higher level than he was willing to show. (Tr. 336).

Next, at Plaintiff's consultive examination, Dr. McKitty noted Plaintiff was six foot three inches tall, weighed 242 pounds, and muscle atrophy or weakness was not present. (Tr. 199, 201-03). During Plaintiff's May 2009 hospitalization, Plaintiff denied musculoskeletal problems or weakness and treatment notes indicated his strength and sensation were grossly intact. (Tr. 210, 232). Similarly, Dr. Heupler found Plaintiff merely had generalized arthritic complaints but found no signs of weakness or atrophy. (Tr. 291-92).

Consistent with the above were Plaintiff's conservative clinical and diagnostic findings concerning his atrial fibrillation and shortness of breath. Indeed, other than his May 2009 hospital visit, the record clearly showed Plaintiff's atrial fibrillation was stable and his lung functioning improved to normal. Hospital treatment notes indicated Plaintiff constantly complained of shortness of breath, yet "his vital signs, saturations, and x-rays were all normal." (Tr. 233). In addition, Dr. Heupler was perplexed by Plaintiff's shortness of breath because there was no "evidence of diastolic

dysfunction of any significance." (Tr. 292). Dr. Heupler's ordered stress test revealed Plaintiff had no chest discomfort and his "exercise capacity [was] good", and pulmonary function tests were within normal limits. (Tr. 286, 259, 251). In August 2009, Plaintiff denied dizziness, had no chest pain, and showed "no clinical signs of heart failure whatsoever." (Tr. 297). In October 2009, Plaintiff denied chest pain, and while an echocardiogram revealed moderate left ventricle hypertrophy, there was no significant valve disease. (Tr. 296). In fact, the Dr. Heupler noted that "[c]ompared with a study from 5/8/09, the LVEF has improved back to normal." (Tr. 296). Plaintiff also had normal sinus rhythm. (Tr. 296). In December 2009, Plaintiff was not experiencing any chest pain, shortness of breath, or edema, and he had normal lung symmetry and clear auscultation in all lung fields. (Tr. 360, 364). Accordingly, the ALJ's RFC finding is supported by substantial evidence.

*Treating Physician*

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § § 404.1527(c) and 416.927(c). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Medical opinions are defined as "statements from physicians . . . that reflect judgements about the nature and severity of [a claimant's] impairments, including . . . symptoms, diagnosis, and prognosis, what [a claimant] can still do despite the impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §§404.1527(a); 416.927(a).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able

11

to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

In addition, even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Rogers*, 486 F.3d at 242. Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

Plaintiff argues the ALJ erred by failing to recognize Ms. Little's evaluation as a treating

physician's opinion because Dr. Hutchinson-Uloa signed it. (Doc. 13, at 9). However, as the ALJ pointed out, the evaluation explicitly stated it was performed by Ms. Little in her professional capacity as an occupational therapist. (Tr. 329-37). Indeed, the ALJ specifically asked Plaintiff's counsel whether or not Dr. Hutchinson-Uloa performed the evaluation. (Tr. 40). In response, counsel admitted the evaluation had not been performed by Dr. Hutchinson-Uloa, and merely pointed out that the doctor signed the report. (Tr. 40). In turn, the ALJ did not accept the report as Dr. Hutchinson-Uloa's because she did not perform the evaluation. (Tr. 22). While Plaintiff strenuously argues Dr. Hutchinson-Uloa's signature on the report makes it her opinion, he points to legal no source supporting this assertion. And, in any event, the ALJ followed the treating physician rule concerning the evaluation itself, regardless of whose opinion it was. The ALJ properly acknowledged the evaluation in question, assigned it little weight, and provided good reasons for doing so.

The ALJ pointed out that Ms. Little's limitations were based on "tremors and depression", yet even Plaintiff concedes there was no mention of tremors in the medical record other than this evaluation. (*See* Tr. 22, 336; Doc. 13, at 11). Indeed, Plaintiff's treatment notes with Drs. Heupler and Lefever did not indicate Plaintiff complained of or suffered from tremors in his hands. (Tr. 297-98, 350-81). Plaintiff also did not complain of, and was not treated for, symptoms associated with tremors during his hospital stay in May 2009. (Tr. 209, 225-32). Not only does the medical record lack a diagnosis or evidence of hand tremors, Dr. McKitty's muscle evaluation report revealed Plaintiff's grasp, pinch, manipulation, and fine coordination were normal in his left and right hands. (Tr. 201).

The ALJ also discounted Ms. Little's evaluation because she was not an acceptable medical source, nor did she treat Plaintiff on a regular basis. (Tr. 22). Once again, while Plaintiff strenuously

13

argues this was Dr. Hutchinson-Uloa's opinion, the Court cannot mask the obvious and disagree with the ALJ's conclusion. It is undisputed Ms. Little performed this one-time evaluation in her capacity as an occupational therapist. It is also undisputed Dr. Hutchinson-Uloa in no way performed or participated in the exam. An evaluation performed by an occupational therapist, explicitly stating it was her opinion in her professional capacity as a therapist, cannot be considered the functional capacity opinion of a treating physician by merely adding a signature, without more.

The ALJ also found Ms. Little's opinion inconsistent with the medical evidence in the record. The undersigned agrees. As noted in the RFC section above, Plaintiff's clinical and diagnostic findings revealed his atrial fibrillation was controlled and his breathing improved with minimal obstruction.

The ALJ is required to analyze medical opinions based on certain factors – examining relationship, treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § § 404.1527(c) and 416.927(c). Here, the ALJ touched upon several of the factors required concerning the evaluation. He noted Ms. Little's specialization, her treatment relationship with Plaintiff, and her inconsistency with the medical record. Accordingly, the ALJ did not violate the treating physician rule and his decision was supported by substantial evidence.

*Past Relevant Work*

Because Plaintiff filed for DIB (Title II) and SSI (Title XVI) there are two relevant time periods regarding Plaintiff's past relevant work at Step 4 of the sequential evaluation. The first time period deals with his DIB claim, which considers past relevant work 15 years prior to the date last insured – in this case December 2006. 20 C.F.R. §§ 404.1560(b)(1) and 404.1565(a). The second time period pertains to Plaintiff's SSI claim, which considers past relevant work only 15 years prior

to his disability filing date – in this case February 2009. Therefore, concerning Plaintiff's DIB claim, the ALJ could consider past relevant work dating back to 1991, and for his SSI claim, dating back to 1994.

In his brief on the merits, Plaintiff conceded there was insufficient medical evidence to support his DIB claim, and therefore focused on the relevant time period for the SSI claim concerning past relevant work dating back to 1994. In doing so, Plaintiff insinuates the ALJ erred by finding Plaintiff could perform past relevant work as a security guard (1982-1991), which pre-dated the relevant time period for an SSI claim. (Doc. 15, at 3). However, Plaintiff fails to recognize the ALJ specifically anticipated this "relevant time period" problem and found Plaintiff could perform other jobs according to the *Dictionary of Occupational Titles (DOT)* – cook helper and bagger – at Step 5 of the sequential evaluation.

In his reply, Plaintiff states he is entitled to a favorable decision if he can prove he is incapable of medium work. However, as noted above, the Court finds the ALJ's RFC finding – that Plaintiff can perform medium work – supported by substantial evidence. Therefore, the ALJ did not err, procedurally or substantively, because he properly took his analysis to Step 5 in light of Plaintiff's SSI time period not covering his past relevant work as a security guard.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI and DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

    s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).